1  Christopher L. Rudd (SBN 130713)
   clrudd@ruddlawpc.com
2  Ariel Harman-Holmes (SBN 315234)
   arielharman.law@gmail.com
3  THE RUDD LAW FIRM
   4650 Sepulveda Boulevard, Suite 205
4  Sherman Oaks, CA 91403
   Tel.: (310) 663-0705
5  Fax: (310) 359-0258

6  *Attorneys for Plaintiffs*

7  [Additional Counsel on Signature Page]

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10 | ADAM METZ and KALEIA PREE, individually and on behalf of all others similarly situated, | **CASE NO.**  3:20-cv-01483 |

11 | | **CLASS ACTION COMPLAINT FOR:** |

12 |                    Plaintiffs, | **1. NEGLIGENCE** |

13 |        v. | **2. INTRUSION INTO PRIVATE AFFAIRS** |

14 | MGM RESORTS INTERNATIONAL, a Delaware corporation, | **3. BREACH OF IMPLIED CONTRACT** |

15 | | **4. UNJUST ENRICHMENT** |

16 |                    Defendant. | **5. NEGLIGENCE *PER SE*** |

17 | | **6. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW [Cal. Bus. & Prof. Code § 17200, *et seq.*** |

18

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**

1.　　Plaintiffs ADAM METZ and KALEIA PREE, individually, and on behalf of all others similarly situated, brings this action against Defendant MGM RESORTS INTERNATIONAL, a Delaware corporation ("MGM" or "Defendant") to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

**JURISDICTION AND VENUE**

2.　　This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 10 million putative class members, many of whom have different citizenship from MGM, including the two named plaintiffs here, who each reside in the Northern District of California.

3.　　This Court has personal jurisdiction over Defendant MGM for at least the following reasons: (i) Defendant regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in this District and in this State; (ii) and Defendant has purposefully established substantial, systematic, and continuous contacts with this District and expects or should reasonably expect to be in court here. Thus, Defendant MGM has sufficient minimum contacts with this District, and this Court's exercise of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

4.　　 Through its business operations in this District, MGM intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

5.　　Venue is proper in this District under 28 U.S.C. § 1391 because Defendant

does business in this District and Defendant is subject to personal jurisdiction in this District.

## NATURE OF THE ACTION

6.     MGM Resorts International is a global hospitality and entertainment company operating destination resorts throughout the world. Millions of people stay in MGM Resort properties every year, and in so doing provide MGM with a host of their personally identifiable information ("PII").[1]

7.     In late 2019, MGM revealed that earlier in the summer an unauthorized individual accessed MGM's computer network system, downloaded customer data and then posted part of the data on a closed internet forum ("Data Breach").

8.     The PII exposed in the Data Breach included, among other things: customer names, addresses, driver's license numbers, passport numbers, military identification numbers, phone numbers, emails and dates of birth.

9.     MGM has indicated that, on or about September 5, 2019, it notified affected customers that their PII had been exfiltrated, but claimed that "there is no evidence that your information has been misused." Seeking to avoid additional negative publicity on the heels of the mass shooting that occurred 8 months earlier, MGM avoided bringing the matter to public light, hoping that the Data Breach and its inadequate cyber security practices which caused the same would go unnoticed.

10.     Unfortunately, the unknown individuals who took and/or acquired the sensitive PII had other plans, and on February 19, 2020, internet technology publication ZDNet revealed that the personally identifiable information of more than 10.6 million

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do     not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

CLASS ACTION COMPLAINT

MGM hotel guests had been posted on a popular internet hacking forum, available for misuse by a host of bad actors.

11.     MGM acknowledged that the exposed PII was a result of the Data Breach that occurred in the summer of 2019.

12.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect customer PII.

13.     Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

14.     Defendant MGM maintained the PII in a reckless manner.  In particular, the PII was maintained on Defendant MGM's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

15.     Defendant disregarded the rights of Plaintiffs and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard customer PII; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

16.    In addition, MGM and its employees failed to properly monitor the computer network and systems that housed the PII.  Had MGM properly monitored its property, it would have discovered the intrusion sooner.

17.    Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant MGM collected and maintained is now in the hands of data thieves.

18.    Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

19.    As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

20.    Plaintiffs and Class Members may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

21.    By their Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose PII was accessed during the Data Breach.

22.    Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

23.    Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) intrusion into private affairs, (iii) breach of implied contract, (iv) unjust enrichment, (v) negligence *per se*, and (vi) deprivation of rights possessed under the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) and California Consumer Privacy Act (Cal. Civ. Code § 1798.100, *et seq.*)

## PARTIES

24.    Plaintiff Adam Metz is, and at all times mentioned herein was, an individual citizen of the State of California residing in the City of El Cerrito (Contra Costa County). Plaintiff Metz is an MGM customer, having stayed at the Aria and Mandalay Bay properties in 2015. During his visits to MGM properties, Plaintiff Metz gave a copy of his driver's license and other PII to Defendant.

25.    Plaintiff Kaleia Pree is, and at all times mentioned herein was, an individual citizen of the State of California residing in the City of El Richmond (Contra Costa County). Plaintiff Pree is an MGM customer, having stayed at the MGM Grand in Las Vegas from January 11, 2016 to January 13, 2016. During her visit to the MGM Grand, Plaintiff Pree gave a copy of her driver's license and other PII to Defendant, and also provided a Chase payment card to Defendant.

26.    Plaintiffs suffered actual injury from having their PII stolen as a result of the Data Breach including, but not limited to: (a) paying monies to MGM for its goods and services which they would not have paid if MGM disclosed that it lacked data security practices adequate to safeguard consumers' PII from theft; (b) damages to and diminution in the value of their PII—a form of intangible property that the Plaintiffs entrusted to MGM as a condition of receiving MGM services; (c) loss of their privacy; (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

27.    As a result of the Data Breach, Plaintiffs will continue to be at heightened risk for financial fraud and identity theft, and their attendant damages for years to come.

28.    Defendant MGM Resorts International is a Delaware corporation headquartered at 3600 Las Vegas Blvd South, Las Vegas, NV 89109. It is a global hospitality and entertainment company operating destination resorts throughout the world.

### STATEMENT OF FACTS

#### A. The MGM Data Breach

29.    On or about July 7, 2019, an unauthorized individual gained access to MGM Resorts International's computer network system, exfiltrated customer data, and then disclosed a subset of that data on a closed internet forum.

30.    The data consisted of a treasure trove of MGM customer PII including: names, addresses, driver's license numbers, passport numbers, military identification numbers, phone numbers, emails and dates of birth.

31.    Although the PII was subsequently removed from the closed internet site, in mid-February 2020 the seemingly full set of data containing the PII of more than 10.6 million MGM guests was published on a well-known hacking forum, visible to any number of dark web miscreants.

32.    Internet security specialists recognized that the PII leaked in the Data Breach presents "a treasure trove" of contact details on customers, many of whom will now "face a higher risk of receiving spear-phishing emails, and being SIM swapped."[2] "The fact that the breach happened about seven months ago without any public disclosure may have led MGM to believe the data was not going to be used by the thieves, but as with many breaches malicious actors sometimes wait months or years to tip their hand" presenting an ongoing problem for affected users.[3]

---

[2] ZDNet, Exclusive: Details of 10.6 million MGM hotel guests posted on a hacking forum, February 19, 2020, https://www.zdnet.com/article/exclusive-details-of-10-6-million-of-mgm-hotel-guests-posted-on-a-hacking-forum/
[3] SC Magazine, February 20, 2020, MGM admits to 2019 data breach affecting 10.6 million customers, https://www.scmagazine.com/home/security-news/data-breach/mgm-admits-to-2019-data-breach-affecting-10-6-million-customers/

33.     On or about September 5, 2019, MGM notified affected customers and various governmental agencies of the Data Breach, but otherwise kept news of the breach quiet. The Notice of Data Incident ("Notice") stated in relevant part.

**Notice of Data Incident**

**What Happened**

On or about July 7, 2019, an individual accessed MGM Resorts International's computer network system without permission. The individual downloaded partial customer data from MGM's computer systems, then posted and disclosed part of the data on a closed internet forum. No customer financial information, passwords or credit cards were part of the data in question and it was taken down and removed from the closed internet site.

**What Information Was Involved**

MGM immediately initiated an internal forensic investigation into this incident. MGM conducted an exhaustive investigation and search of the downloaded data from the closed internet site. On August 9, 2019, MGM determined your First Name, Last Name, and Driver's License Number were part of the compromised file. Again, no financial information, passwords or credit cards were included in the database.

**What We Are Doing**

We take the security of our customers' data seriously, and after MGM became aware of the event, we took immediate measures to investigate and remediate the incident. We have implemented additional safeguards to improve further data security related to external software incidents. Furthermore, MGM reported the incident to law enforcement immediately once MGM discovered the matter. In addition, we are offering identity theft protection services through ID Experts®, the data incident and recovery services expert, to provide you with MyIDCare™. MyIDCare services include: 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services. With this protection, MyIDCare will help you resolve issues if your identity is compromised.

**What You Can Do**

We encourage you to contact ID Experts with any questions and to enroll in free MyIDCare services by calling 833-959-1344 or going to https://ide.myidcare.com/mgmri and using the Enrollment Code provided above.

\*\*\*

Again, at this time, there is no evidence that your information has been misused. However, we encourage you to take full advantage of this service offering. MyIDCare representatives have been fully versed on the incident and can answer questions or concerns you may have regarding protection of your personal information.

**B. MGM Privacy Policies**

34.     MGM maintains a Privacy Policy wherein it details the PII it collects from customers and promises to maintain the security and integrity of such data.

MGM RESORTS PRIVACY POLICY[4]

MGM Resorts International values your patronage and respects your privacy. This Privacy Policy ("Policy") describes the information collection, use, protection, and sharing practices of MGM Resorts International and MGM Resorts International web sites, mobile applications, electronic communications, and properties

We collect information from a variety of sources and in a variety of ways, including the following:

**Personal Information**. When you visit, use, and/or access MGM Resorts or MGM Online Services, you may provide us with (and/or we may collect) information by which you can be personally identified including your name, date of birth, postal address, e-mail address, and telephone number, and videos, recordings, and images of you ("Personal Information"). We may also obtain Personal Information from third parties.

**Sensitive Information**. When you make a purchase, visit, use and/or access MGM Resorts MGM Online Services, or engage in other transactions or activities, you may provide us with sensitive Personal Information including your credit or debit card number, financial account number, biometrics, medical/health-related information, driver's license number, government-issued identification card number, social security number, passport number, or naturalization number ("Sensitive Information").

**SECURITY**

Information maintained in electronic form that is collected by MGM Resorts International and any individual MGM Resort is stored on systems protected by industry standard security measures. These security measures are intended to protect these systems from unauthorized     access. No security system is impenetrable and these systems could become accessible in the event of a security breach. We have controls in place that are designed to detect potential data breaches, contain and minimize the loss of data, and conduct forensic investigations of a breach.

Our staff is required to take reasonable measures to ensure that unauthorized persons cannot view or access your Personal Information. Employees who violate our internal privacy policies are subject to disciplinary action, up to and including termination of employment.

---

[4] https://www.mgmresorts.com/en/privacy-policy.html

35.    Although MGM claims to employ "industry standard security measures," this representation, along with the promise to maintain the integrity of customer PII was belied by its failure to impose and maintain the necessary safeguards that would have prevented the Data Breach.

### C. Prevalence of Cyber Attacks and Susceptibility of the Hotel Industry

36.    Data breaches, including those perpetrated against the hospitality industry, have become widespread.  In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year.  In 2017, a new record high of 1,579 breaches were reported, representing a 44.7 percent increase over 2016.  In 2018, there was an extreme jump of 126 percent in the number of consumer records exposed from data breaches.  In 2019, there was a 17 percent increase in the number of breaches (1,473) over 2018, with 164,683,455 sensitive records exposed.[5]

37.    The type of PII collected by hotels and resorts such as those of Defendant makes this sector particularly attractive to cyber-attackers. Trustwave's "2018 Global Security Report" lists hospitality as one of the top three industries most vulnerable to payment card breaches while other estimates project that hotels are the unwelcome recipients of around 20 percent of all cyberattacks.[6]  Indeed, in recent years, Marriott Hilton, Hyatt, and Trump hotels have all been cited for large-scale data negligence over the past few years. "Such unfortunate trends should not come as much of a surprise since hotels are hotbeds of sensitive information. Their data is spread out across porous digital systems and their sales are usually conducted through weak point-of-sale systems."[7]

---

[5] https://www.idtheftcenter.org/identity-theft-resource-centers-annual-end-of-year-data-breach-report-reveals-17-percent-increase-in-breaches-over-2018/

[6] Hotel management, Why cybersecurity matters, https://www.hotelmanagement.net/tech/why- cybersecurity-matters

[7] *Id.*

CLASS ACTION COMPLAINT

38.        "While hospitality companies have fewer transactions than retail organizations — and thus have data on fewer customers to steal — they collect substantially more valuable and varied personal data for each of their guests…. This rich personal data is invaluable to cybercriminals. They can use this data to better impersonate each breached customer, leading to additional identity theft and social engineering attacks against each individual's company. By enabling further attacks, breaching a hotel provides cybercriminals much more value than breaching a company in almost any other industry."[8]

**D. MGM Acquires, Collects, and Stores Plaintiffs' and Class Members' PII.**

39.    As its Privacy Policy makes clear, MGM acquires, collects, and stores a massive amount of personally identifiable information on its customers.

40.        As a condition of staying at its hotel properties, MGM requires that its customers entrust it with highly sensitive personal information.

41.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, MGM assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

42.    Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

43.        Plaintiffs and the Class Members relied on MGM to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**E. The Value of Personally Identifiable Information and the Effects of Unauthorized Disclosure**

44.    MGM was well-aware that the PII it collects is highly sensitive, and of significant value to those who would use it for wrongful purposes.

---

[8] Cybersecurity in Hospitality: An Unsolvable Problem?, Paladion Networks, https://www.paladion.net/cybersecurity-in-hospitality-an-unsolvable-problem

45.    Personally identifiable information is a valuable commodity to identity thieves. As the FTC recognizes, with PII identity thieves can commit an array of crimes including identify theft, medical and financial fraud.[9] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites – an occurrence that happened in this case.

46.    The ramifications of MGM's failure to keep its customers' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

47.    "The fact that the breach happened about seven months ago without any public disclosure may have led MGM to believe the data was not going to be used by the thieves, but as with many breaches malicious actors sometimes wait months or years to tip their hand. This is a great example of how these breaches and their fallout can continue to haunt businesses for quite some time. It's likely MGM thought this incident was far in the rear view, but the value of their particular dataset continues to have appeal…."[10]

48.    At all relevant times, MGM knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if its data security systems were breached, including, the significant costs that would be imposed on customers as a result of a breach.

49.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard the MGM computer systems and data.    Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

---

[9] Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft

[10] SC Magazine, February 20, 2020, MGM admits to 2019 data breach affecting 10.6 million customers, https://www.scmagazine.com/home/security-news/data-breach/mgm-admits-to-2019-data-breach-affecting-10-6-million-customers/

CLASS ACTION COMPLAINT

   a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

   b.  Failing to adequately protect consumers' PII;

   c.  Failing to properly monitor its own data security systems for existing intrusions, and;

   d.  Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

### F. MGM Fails to Comply with FTC Guidelines

50.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[11]

51.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses.[12] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

52.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require

---

[11] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[12] https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business

complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[13]

53.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

54.    MGM failed to properly implement basic data security practices. MGM's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

55.    MGM was at all times fully aware of its obligation to protect the PII of customers. MGM was also aware of the significant repercussions that would result from its failure to do so.

**G. MGM Fails to Comply with Industry Standards**

56.    Cyber security firms have routinely identified the hotel sector as one being particularly vulnerable to cyber-attacks because of the value of the PII which they maintain. These firms have promulgated a series of best practices that a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security

---

[13] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

systems; protection against any possible communication system; training hotel staff regarding critical points.[14]

57.    MGM acknowledged the Data Breach was through a cloud server exposure. Although it did not state how or why the cloud server was exposed, "this could have easily been caused from poor cloud configuration and security hygiene…."[15]

**H. Plaintiffs and Class Members Suffered Damages**

58.    The ramifications of Defendant's failure to keep Customers' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.

59.    The PII belonging to Plaintiffs and Class Members is private, sensitive in nature, and was left inadequately protected by Defendant who did not obtain Plaintiffs' or Class Members' consent to disclose such PII to any other person as required by applicable law and industry standards.

60.    The Data Breach was a direct and proximate result of MGM's failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

61.    Defendant is a multi-billion-dollar company and had the resources necessary to prevent the Breach, but neglected to adequately invest in data security measures, despite its obligation to protect customer data.

---

[14] https://opendatasecurity.io/how-to-work-on-hotel-cyber-security/
[15] SC Magazine, February 20, 2020, MGM admits to 2019 data breach affecting 10.6 million customers, https://www.scmagazine.com/home/security-news/data-breach/mgm-admits-to-2019-data-breach-affecting-10-6-million-customers/

62.        Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into their systems and, ultimately, the theft of PII.

63.    As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[16]

64.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GOA Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[17]

65.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[18]

---

[16] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf
[17] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 12, 2019) ("GAO Report").
[18] *See* https://www.identitytheft.gov/Steps (last visited April 12, 2019).

CLASS ACTION COMPLAINT

66.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

67.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[19]



[19] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited June 20, 2019).

68.    What's more, PII constitutes a valuable property right, the theft of which is gravely serious.[20] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

69.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when PII and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

70.    PII and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

71.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts for many years to come.

## PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

72.    To date, MGM has merely offered 12 months of identity monitoring

---

[20] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

services at no charge. The offer, however, is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and it entirely fails to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

73.    Furthermore, Defendant's credit monitoring offer to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions "offering" the services to affected customers with the recommendation that they sign up for the services.

74.    Plaintiffs and Class Members have been damaged by the compromise of their PII in the Data Breach.

75.    Plaintiffs' PII was compromised as a direct and proximate result of the Data Breach.

76.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

77.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

78.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

79.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential

fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

80.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

81.    Plaintiffs and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach.  Numerous courts have recognized the propriety of loss of value damages in related cases.

82.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security but was not.  Part of the price Plaintiffs and Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of Defendant MGM's computer property and Plaintiffs' and Class Members' PII. Thus, Plaintiffs and the Class Members did not get what they paid for.

83.    Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

84.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

     a.  Finding fraudulent charges;

     b.  Canceling and reissuing credit and debit cards;

     c.  Purchasing credit monitoring and identity theft prevention;

     d.  Addressing their inability to withdraw funds linked to compromised accounts;

     e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

     f.  Placing "freezes" and "alerts" with credit reporting agencies;

g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.  Contacting financial institutions and closing or modifying financial accounts;

i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

85.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

86.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their PII—which contains the most intimate details about a person's life —may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

87.    Plaintiffs and the Class Members were also injured in that they were deprived of rights they possess under the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) and California Consumer Privacy Act (Cal. Civ. Code § 1798.100, et seq.) to keep their PII secure and confidential.

88.    As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of

privacy, and are at an increased risk of future harm.

89.    What's more, Defendant's delay in identifying and reporting the Data Breach caused additional harm. It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the    act."[21]

90.    Indeed, once a data breach has occurred, "[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).[22]

91.    Although their PII was improperly exposed in July, affected customers were not notified of the Data Breach until September, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.  As a result of MGM's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiffs and Class Members has been driven even higher.

## CLASS ACTION ALLEGATIONS

92.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class").

---

[21]*Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire, https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million.
[22] Consumer Reports, The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too, January 31, 2019, https://www.consumerreports.org/data-theft/the-data-breach-next-door/

93.     Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

All persons whose PII was compromised as a result of the Data Breach announced by MGM on or about September 5, 2019 (the "Class").

All persons residing in the State of California whose PII was compromised as a result of the Data Breach announced by MGM on or about September 5, 2019 (the "California Subclass").

94.     Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

95.     Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

96.     Numerosity.  The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of approximately 10.6 million customers of Defendant MGM whose data was compromised in the Data Breach.

97.     Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.     Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

b.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their PII;

f.    Whether Defendant breached its duty to Class Members to safeguard their PII;

g.    Whether computer hackers obtained Class Members' PII in the Data Breach;

h.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.    Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    Whether Defendant's conduct was negligent;

k.    Whether Defendant's conduct was *per se* negligent;

l.    Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

m.    Whether Defendant was unjustly enriched;

n.    Whether Defendant violated the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq*.);

o.    Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

p.    Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

98.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class member, was compromised in the Data Breach.

99.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating Class actions, including data privacy litigation of this kind.

100.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

101.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

102.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

103.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether MGM failed to timely notify the public of the Data Breach;

b.    Whether MGM owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.    Whether MGM's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.    Whether Defendant failed to take commercially reasonable steps to safeguard customer PII; and

f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the data breach.

104.    Finally, all members of the proposed Classes are readily ascertainable. MGM has access to customer names and addresses affected by the Data Breach. Using this information, Class members can be identified and ascertained for the purpose of providing notice.

**CAUSES OF ACTION**

**<u>FIRST COUNT</u>**

**NEGLIGENCE**

**(On Behalf of Plaintiffs and All Class Members)**

105.    Plaintiff re-allege and incorporate by reference Paragraphs 1 through 105 above as if fully set forth herein.

106.    Defendant required Plaintiffs and Class Members to submit non-public PII in order to obtain services.

26

107.    Plaintiffs and the Class Members entrusted their PII to MGM with the understanding that MGM would safeguard their information.

108.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

109.    By collecting and storing this data in its computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

110.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

111.    In addition, Cal. Civ. Code §1798.81.5 requires Defendant to take reasonable steps and employ reasonable methods of safeguarding the PII of Class Members who are California residents.

112.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

113.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

  a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

27

b.　　　Failing to adequately monitor the security of their networks and systems;

c.　　Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.　　　Allowing unauthorized access to Class Members' PII;

e.　　Failing to detect in a timely manner that Class Members' PII had been compromised; and

f.　　Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

114.　It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members.  Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the hotel and hospitality industry.

115.　It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

116.　There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

117.　As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

CLASS ACTION COMPLAINT

118.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach

119.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND COUNT

## INTRUSION INTO PRIVATE AFFAIRS/INVATION OF PRIVACY

## (On Behalf of Plaintiffs and All Class Members)

120.    Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 105 as if fully set forth herein.

121.    California established the right to privacy in Article I, Section 1 of the California Constitution.

122.    The State of California recognizes the tort of Intrusion into Private Affairs, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

123.    Plaintiffs and Class Members had a reasonable expectation of privacy in the PII Defendant mishandled.

124.    Defendant's conduct as alleged above intruded upon Plaintiffs' and Class Members' seclusion under common law.

125.    By intentionally failing to keep Plaintiffs' and Class Members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiffs' and Class Members' privacy by:

a.  Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiffs and Class Members and that would be highly offensive and objectionable to an ordinary person; and

b.  Intentionally publicizing private facts about Plaintiffs and Class Members, which is highly offensive and objectionable to an ordinary person; and

c.  Intentionally causing anguish or suffering to Plaintiffs and Class Members.

126.    Defendant knew that an ordinary person in Plaintiffs' or a Class Member's position would consider Defendant's intentional actions highly offensive and objectionable.

127.    Defendant invaded Plaintiffs and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by intentionally misusing and/or disclosing their PII without their informed, voluntary, affirmative, and clear consent.

128.    Defendant intentionally concealed from Plaintiffs and Class Members an incident that misused and/or disclosed their PII without their informed, voluntary, affirmative, and clear consent.

129.    As a proximate result of such intentional misuse and disclosures, Plaintiffs' and Class Members' reasonable expectations of privacy in their PII was unduly frustrated and thwarted. Defendant's conduct, amounting to a substantial and serious invasion of Plaintiffs' and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

130.    In failing to protect Plaintiffs' and Class Members' PII, and in intentionally misusing and/or disclosing their PII, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private.  Plaintiffs, therefore, seeks

an award of damages on behalf of themselves and the Class.

## THIRD COUNT

**Breach of Implied Contract**

**(On Behalf of Plaintiffs and All Class Members)**

131.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 105 above as if fully set forth herein.

132.    Plaintiff and Class Members were required to provide their PII to Defendant as a condition of their use of Defendant's services.

133.    Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII from unauthorized disclosure.

134.    In its written privacy policies, MGM expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

135.    MGM promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

136.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

137.    When Plaintiffs and Class Members provided their PII to Defendant MGM in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

138.    Defendant solicited and invited Class Members to provide their PII as part

of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

139.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

140.    Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

141.    Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.  Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

142.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

143.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

144.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

145.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

146.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## **FOURTH COUNT**

### **Unjust Enrichment**

### **(On Behalf of Plaintiffs and All Class Members)**

147.    Plaintiffs restate and reallege paragraphs 1 through 105 above as if fully set forth herein.

148.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and in so doing provided Defendant with their PII. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

149.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

150.    The amounts Plaintiffs and Class Members paid for goods and services were used, in part, to pay for use of Defendant's network and the administrative costs of data management and security.

151.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

152.    Defendant failed to secure Plaintiffs' and Class Members' PII and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

153.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

154.    If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to Defendant's services.

CLASS ACTION COMPLAINT

155.        Plaintiffs and Class Members have no adequate remedy at law.

156.        As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

157.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

158.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## **FIFTH COUNT**

### **Negligence *Per Se***

### **(On Behalf of Plaintiffs and All Class Members)**

159.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 105 above as if fully set forth herein.

160.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

161.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as MGM, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

162.    MGM violated Section 5 of the FTC Act by failing to use reasonable measures to protect customer PII and not complying with applicable industry standards, as described in detail herein. MGM's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

163.    MGM's violation of Section 5 of the FTC Act constitutes negligence *per se* as MGM's violation of the FTC Act establishes the duty and breach elements of negligence.

164.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

165.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

166.    Pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Defendant had a duty to protect the security and confidentiality of Plaintiff's and Class Members' Private Information.

167.   Defendant breached its duties to Plaintiff and Class Members under the Gramm-Leach-Bliley Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

168.   Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

169.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

170.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

171.   As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## SIXTH COUNT

**Violation of the California Unfair Competition Law**

**Cal Bus. & Prof. Code § 17200, *et seq*.**

**(On Behalf of Plaintiffs and All Class Members, including the California Subclass)**

172.   Plaintiffs repeat and re-allege each and every factual allegation contained in Paragraphs 1 through 105 as if fully set forth herein.

173.   The California Unfair Competition Law, Cal Bus. & Prof. Code § 17200, *et seq*. prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant

CLASS ACTION COMPLAINT

engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

174.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

175.    In the course of conducting its business, Defendant committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Class Members' PII, and violating the statutory and common law alleged herein in the process, including, *inter alia*, the California CRA, the California CCPA, the Federal Trade Commission Act, and the Gramm- Leach-Bliley Act. Plaintiffs and Class Members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

176.    Defendant also violated the UCL by failing to timely notify Plaintiffs and Class Members regarding the unauthorized release and disclosure of their PII. If Plaintiffs and Class Members had been notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII and identities.

177.    Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous. The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

178.    The UCL also prohibits any "fraudulent" business act or practice, above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

179.    By the acts and conduct alleged herein, Defendant committed fraudulent acts and practices by:

a.    failure to maintain adequate computer systems and data security practices to safeguard PII;

b.    failure to disclose that its computer systems and data security practices were inadequate to safeguard PII from theft;

c.    continued gathering and storage of PII, and other personal information after Defendant knew or should have known of the security vulnerabilities of its computer systems that were exploited in the Data Breach;

d.    making and using false promises, set out in the MGM Privacy Policies, about the privacy and security of PII and the Private Information of Plaintiffs and Class Members, and;

e.    continued gathering and storage of PII and other personal information after Defendant knew or should have known of the Data Breach and before Defendant allegedly remediated the data security incident.

180.    Defendant's business practices, as alleged herein, constitute fraudulent conduct because they were likely to deceive, and did deceive, Plaintiff and Class Members into purchasing Defendant's services when those services were misrepresented and otherwise did not perform as advertised as to the confidentiality, safety, and security of PII.

181.    The foregoing fraudulent acts and practices are deceptive and misleading in a material way because they fundamentally misrepresent the character of the services provided, specifically as to the safety and security of PII and other personal and private information, to induce consumers to purchase the same.

182.    Defendant's unconscionable commercial practices, false promises, misrepresentations, and omissions set forth in this Complaint are material in that they relate to matters which reasonable consumers, including Plaintiffs and Members of the Class, would attach importance to in making their purchasing decisions or conducting themselves regarding the purchase of services from Defendant.

183.    Plaintiffs and Members of the Class relied upon the representations in the MGM Privacy Policies.

184.    As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud – risks justifying expenditures for protective and remedial services for which she is entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of her PII, (iv) deprivation of the value of their PII, for which there is a well-established national and international market, and/or (v) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

185.    Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiffs, therefore, on behalf of themselves, Class Members, and the general public, also seek restitution and an injunction prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Cal. Bus. & Prof. Code § 17203.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a) For an Order certifying this action as a Class action and appointing Plaintiffs and their counsel to represent the Class;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e) Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of punitive damages, as allowable by law;

h) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i) Pre- and post-judgment interest on any amounts awarded; and

j) Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

CLASS ACTION COMPLAINT

1    Dated: February 28, 2020                    Respectfully submitted,

2                                                */s/ Christopher L. Rudd*
                                                 Christopher L. Rudd (SBN 130713)
3                                                THE RUDD LAW FIRM
                                                 2650 Sepulveda Blvd., Suite 205
4                                                Sherman Oaks, CA 91403
                                                 Tel.: (310) 663-0705
5                                                Fax: (310) 359-0258
                                                 clrudd@ruddlawpc.com
6
                                                 Gary M. Klinger*
7                                                **KOZONIS & KLINGER, LTD.**
                                                 227 W. Monroe Street, Suite 2100
8                                                Chicago, IL 60630
                                                 Tel.: (312) 283-3814
9                                                Fax: (773) 496-8617
                                                 gklinger@kozonislaw.com
10
                                                 Jeffrey S. Goldenberg*
11                                               **GOLDENBERG SCHNEIDER L.P.A.**
                                                 One West Fourth Street, 18th Floor
12                                               Cincinnati, OH 45202
                                                 Tel: (513) 345-8291
13                                               Fax: (513) 345-8294
                                                 jgoldenberg@gs-legal.com
14
                                                 Charles E. Schaffer*
15                                               **LEVIN, SEDRAN & BERMAN, LLP**
                                                 510 Walnut Street, Suite 500
16                                               Philadelphia, PA 19106
                                                 Tel: (215) 592-1500
17                                               Fax: (215) 592-4663
                                                 cschaffer@lfsblaw.com
18
         *pro hac vice to be filed*                           *Attorneys for Plaintiffs*
19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT